[No. H027237. Sixth Dist. July 6, 2005.]

RANDALL GILBERT, Plaintiff and Appellant, v.
CITY OF SUNNYVALE, et al., Defendants and Respondents.

1268

## COUNSEL

Craig M. Brown for Plaintiff and Appellant.

Joan A. Borger, City Attorney; Liebert Cassidy Whitmore and Cynthia O'Neill for Defendants and Respondents.

## OPINION

**ELIA, J.**—Randall Gilbert, formerly a public safety officer with the City of Sunnyvale, was terminated from his employment for cause. He appeals from the denial of his petition for a preemptory writ of mandate.

His petition alleged denials of procedural due process and noncompliance with Government Code section 3303, subdivision (g), a provision of the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.; Bill of Rights Act or Act).[1] On appeal, appellant Gilbert asserts that his termination was based upon respondents' conclusion that he was "on the take" and the respondents' constitutional and statutory violations have prevented him "from adequately and fairly responding to those allegations and

---

[1] All further statutory references are to the Government Code unless otherwise stated.

from disproving them." Additionally, appellant insists that to comport with due process, "the 'legal advisor' to the Personnel Board [during the appeal process] should not be an attorney hired and paid for by the City with a past relationship with the City and with future expectation of further employment by the City."

We find no merit to his contentions and affirm.

A. *Background*

The appellant's alleged conduct that led to the disciplinary action against him was discovered in the context of a larger investigation into an alleged prostitution business. Captain Chuck Eaneff with the Sunnyvale Department of Public Safety, stated in his declaration: "In April 2000, the Department of Public Safety was contacted by citizen informants about illegal activity at a Korean hostess bar in Sunnyvale known as the Crystal Palace. An initial investigation was commenced. In June 2000 the Department contacted the Federal Bureau of Investigation (FBI). Shortly thereafter, the FBI opened an investigation and began covert undercover activity." Captain Eaneff indicated that the investigation involved the State Department of Justice, the United States Attorney, the Internal Revenue Service, the Immigration and Naturalization Service, and the California Alcoholic Beverage Control Commission and it extended beyond the borders of California.

Eaneff stated that, on July 22, 2002, various suspects were arrested and "[l]ocally, . . . the Assistant United State[s] Attorney issued criminal complaints against 6 defendants . . . ." In the course of the foregoing investigation, four or more public safety officers, including appellant, had been "observed in activities giving rise to concerns of improper conduct." According to Eaneff, "[o]n October 24, 2002 the Director of Public Safety/Chief initiated a Chief's Case (a type of internal affairs investigation) with regard to activities possibly in violation of local rules and regulations engaged in by the three officers who remained employed by the City of Sunnyvale."

Lieutenant Christopher Carrion stated in his declaration that he was assigned to conduct the internal affairs investigation known as Chief's Case CR-02-12351. According to the lieutenant, "[t]he investigation contained 16 allegations, 7 involving Petitioner Gilbert, 2 involving a second officer and 7 involving a third officer."

The Sunnyvale Department of Public Safety (Department) placed appellant Gilbert on administrative leave on November 11, 2002. The Department's Director, Chief Irwin I. Bakin, issued a memo to all personnel, announcing that Gilbert had been placed on administrative leave "related to

the Korean hostess bar investigation." On November 11, 2002, appellant received formal notice, which informed him that allegations of misconduct had been filed with the Department, directed him to contact Internal Affairs Investigation Lieutenant Carrion to arrange an interview, and advised him that failure to comply would result in discipline. Lieutenant Carrion personally presented the notice to appellant. On November 14, 2002, Lieutenant Carrion interrogated appellant.

On January 17, 2003, Lieutenant Carrion submitted an investigation report, chief's case CR 02-12351 (hereinafter Chief's Case), to Chief Bakin. On February 6, 2003, appellant received a notice of intended discipline, which advised him that Bakin intended to recommend to the city manager that appellant be terminated effective February 28, 2003. At or about that time, appellant also received the Chief's Case.

The notice set forth the grounds for dismissal and the supporting facts. The focus of the disciplinary action was appellant's conduct on March 10 and 11, 2002, in accessing Department of Motor Vehicles (DMV) computer files, obtaining confidential information, and releasing confidential DMV information over the phone to an unidentified female without a legitimate law enforcement purpose. The notice also indicated that on October 6, 2000, appellant, while on duty, had accepted a meal without charge from Crystal Palace owner Roger Li.

The notice indicated that the disciplinary action was based upon "the information contained herein and in the documents provided in Chief's Case CR02-12351." It informed appellant that copies of taped witness interviews and any photographs taken during the course of the investigation pertaining to the disciplinary action would be made available to him upon request. The notice explained the upcoming opportunity to respond and the written appeal process.

The Chief's Case stated that the "source documents" supporting many of the allegations remain with the Federal Bureau of Investigation (FBI) and that the federal case "remains open and active." It further provided: "When the Federal case dictates, source documents will be released to the Sunnyvale Department of Public Safety." It indicated that the information contained in the report came from a number of individuals within the city and the Department of Justice Records Bureau and "[m]uch of the information was communicated" to a named detective by FBI investigators.

The Chief's Case provided background information describing the appellant's activities predating the alleged misconduct, which it concluded shows that "[Officer] Gilbert assisted the owners and operators of the Crystal Palace in the prostitution business." Those activities identified in the Chief's Case

included appellant visiting the Crystal Palace numerous times and driving Asian females in his personal vehicle to residences of prostitutes, and telephoning massage businesses and businesses associated with prostitution, residences of prostitutes, and the female proprietor of the Crystal Palace.

The Chief's Case indicated the FBI had advised that, on March 7, 2002, FBI surveillance vehicles followed the Crystal Palace proprietors' vehicle during a trip to the airport to pick up a prostitute but apparently were spotted. The male proprietor of the Crystal Palace was seen writing down license plates.

The Chief's Case sustained six allegations of misconduct by appellant. Four of the allegations involved appellant accessing DMV files utilizing a Sunnyvale Department of Public Safety computer terminal while on duty and without legitimate law enforcement purpose on March 10, 2002, or March 11, 2002. According to the investigation report, evidence showed that appellant was on duty as desk officer during the relevant times on March 10 and 11, 2002, official inquiries were made as to two license plate numbers from a terminal assigned to the Department, the operator identification number used in each instance belonged to appellant, one of the license plate numbers belonged to a FBI agent's vehicle, and the other license plate number was one digit off from one of the FBI surveillance vehicles. A fifth allegation involved appellant verbally releasing confidential DMV information over the phone, while on duty and without legitimate law enforcement purpose, to an unidentified female on March 10, 2002. The Chief's Case stated that "[Officer] Gilbert received favors from the house of prostitution and in exchange unlawfully accessed state and federal computer systems, running two undercover F.B.I. license plates involved in the covert surveillance of the pickup of a prostitute at the San Jose airport."

A sixth sustained allegation stated that appellant had accepted and consumed a meal, which Crystal Palace owner Roger Li provided without charge, while appellant was on duty and in full police uniform on October 6, 2000. The Chief's Case did not sustain an allegation that appellant failed to report violations of state and federal laws, city ordinances and departmental orders by other Department employees. The remaining nine allegations involved other officers.

In response to his request, appellant received 10 audiotapes consisting of interviews with him, Captain Eaneff, Officer Lecy, and Lieutenant Verbrugge, and the March 10, 2002 and March 11, 2002 telephone calls. A pretermination hearing was held on February 20, 2003, and the city manager terminated appellant effective February 28, 2003. Appellant appealed the decision to the city's personnel board.

On June 23, 2003, in response to a June 9, 2003 letter from appellant's attorney complaining that appellant had not received all the relevant investigatory materials, the city attorney sent a letter to appellant's attorney identifying additional materials being provided to appellant's attorney. Additional materials were provided, including, inter alia, several crime reports, interview statements, a State Department of Justice letter regarding possible "CLETS" misuse, and a redacted FBI undercover report.[2] The city attorney's letter explained: "References in Chief's Case CR # 02-12351 to actions taken by the FBI in the course of the FBI's investigation are not materials the Department of Public Safety has or has access to, and most information 'communicated to Det. Lt. Tom Piatanesi from the Federal Bureau of Investigation case investigators' was communicated orally so there are no supporting materials. Similarly, when Lt. Verbrugge was invited to view FBI videos it was for the purpose of identifying individuals on the videos to the FBI. The City did not receive copies of those videos. The FBI case is still ongoing and the City does not have authority to do anything which might compromise that case."

In a subsequent letter dated July 16, 2003, to appellant's attorney, the city attorney disputed that there had been a *Skelly*[3] violation. She maintained that appellant Gilbert had not been disciplined on the ground he had assisted the owners and operators of the Crystal Palace in the prostitution business. She emphasized that appellant had been "disciplined for inappropriately accessing the CLETS system and revealing the results of the searches he ran to a third party."

As of the date of Captain Eaneff's October 2003 declaration, the federal case was still pending and was "still in discovery in conjunction with the criminal indictments."

As of the date of appellant's December 2003 declaration, he had not received certain specified documents, including FBI and other source documents, FBI wiretap materials, and a grand jury telephone matrix.

B. *Writ of Mandate*

██ "In a petition for writ of mandate brought pursuant to Code of Civil Procedure section 1085, . . . the petitioner bears the burden of pleading and proving the facts on which the claim for relief is based. (Code Civ. Proc.,

---

[2] The Chief's Case defines CLETS: "The California Law Enforcement Telecommunications System (CLETS) is a high-speed message computer network of Local, State and Federal databases and systems. It provides all law enforcement user agencies with the capability of obtaining information directly from State and Federal computerized information files."

[3] *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774].

§ 1109; Evid. Code, § 500; [citations].)" (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1153–1154 [43 Cal.Rptr.2d 693, 899 P.2d 79].) In resolving questions of law on appeal from a denial of a writ of mandate, an appellate court exercises its independent judgment. (See *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 109 [61 Cal.Rptr.2d 134, 931 P.2d 312]; *Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].)

## C. *Procedural Due Process*

### 1. *Skelly Rights*

Appellant essentially asserts that, as a matter of procedural due process, he was entitled to all documents identified in the Chief's Case prior to his pretermination hearing on February 20, 2003, pursuant to *Skelly v. State Personnel Bd., supra*, 15 Cal.3d 194. Appellant specifies that he was timely denied, among other documents, (1) the Department's criminal investigation report (CR 02-11786), (2) the grand jury subpoena for telephone numbers, which lists all contact telephone numbers for individuals identified as a result of the FBI investigation, (3) the FBI general activity report for surveillance between June 26, 2000, and March 7, 2002, and (4) Lieutenant Piatanesi's case notes documenting communications between federal agencies. These items were identified in the Chief's Case as being "contained within" or "included within" the investigation. He seeks back pay beginning March 1, 2003, "continuing until such time as he is provided with all of the materials giving rise to the disciplinary action, and then receives a predisciplinary hearing at which he can truly respond to the allegations, or alternatively, until such time as Respondents comply with the requirements of the 'Act' and thereafter provide [him] with a fair hearing before the Personnel Board."

In *Skelly v. State Personnel Bd., supra*, 15 Cal.3d 194, the California Supreme Court determined that "due process does not require the state to provide the [permanent civil service] employee with a full trial-type evidentiary hearing prior to the initial taking of punitive action." (*Id.* at p. 215.) The court held that "the provisions of the State Civil Service Act, including in particular section 19574, governing the taking of punitive action against a permanent civil service employee violate the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and of article I, sections 7 and 15 of the California Constitution" because punitive disciplinary action against an employee cannot properly be taken by simple notification. (*Skelly v. State Personnel Bd., supra*, 15 Cal.3d at pp. 202, 215.) Relying heavily upon its understanding of the various opinions in *Arnett v. Kennedy* (1974) 416 U.S. 134 [40 L.Ed.2d 15, 94 S.Ct. 1633] (plurality opinion with concurring and dissenting opinions), which upheld the constitutionality of the statutory procedure for disciplining nonprobationary federal

civil service employees, the California high court determined that the minimum procedural due process protections required before disciplinary action became effective included "notice of the proposed action, the reasons therefor, a copy of the charges and *materials upon which the action is based*, and the right to respond, either orally or in writing, to the authority initially imposing discipline." (*Skelly v. State Personnel Bd., supra*, 15 Cal.3d at p. 215, italics added.)

In *Arnett*, the Supreme Court considered the federal removal procedures, which included a civil service commission regulation that provided that "the material on which the notice [of proposed adverse action against an employee] is based and which is relied on to support the reasons in that notice, including statements of witnesses, documents, and investigative reports *or extracts therefrom*, shall be assembled and made available to the employee for his review." (*Arnett v. Kennedy, supra*, 416 U.S. at p. 143, fn. 9, italics added.) The plurality view that a federal nonprobationary civil service employee did not have "an expectancy of job retention" that required "procedural protection under the Due Process Clause beyond that afforded here by the [applicable federal] statute and related agency regulations" (*id.* at p. 163) was later rejected by the Supreme Court. (*Cleveland Board of Education v. Loudermill* (1985) 470 U.S. 532, 541 [84 L.Ed.2d 494, 105 S.Ct. 1487].)

■ Subsequent to *Skelly*, the California Supreme Court and the United States Supreme Court have repeatedly recognized that due process is a flexible concept. (See, e.g., *Civil Service Assn. v. City and County of San Francisco* (1978) 22 Cal.3d 552, 561 [150 Cal.Rptr. 129]; *Gilbert v. Homar* (1997) 520 U.S. 924, 930 [138 L.Ed.2d 120, 117 S.Ct. 1807].) "It is by now well established that ' "due process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U.S. 886, 895 [6 L.Ed.2d 1230, 81 S.Ct. 1743, 1748] (1961). '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' *Morrissey* v. *Brewer*, 408 U.S. 471, 481 [33 L.Ed.2d 484, 92 S.Ct. 2593, 2600] (1972). [The United States Supreme] Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause. See, e.g., *United States* v. *James Daniel Good Real Property*, 510 U.S. 43, 53 [126 L.Ed.2d 490, 114 S.Ct. 492, 500-501] (1993); *Zinermon* v. *Burch*, 494 U.S. 113, 128 [108 L.Ed.2d 100, 110 S.Ct. 975, 984-985] (1990) (collecting cases); *Barry* v. *Barchi*, 443 U.S. 55, 64-65 [61 L.Ed.2d 365, 99 S.Ct. 2642, 2649-2650] (1979); *Dixon* v. *Love*, 431 U.S. 105, 115 [52 L.Ed.2d 172, 97 S.Ct. 1723, 1729] (1977); *North American Cold Storage Co.* v. *Chicago*, 211 U.S. 306, 314-320 [53 L.Ed. 195, 29 S.Ct. 101, 103-106, 6 Ohio L.Rep. 665] (1908)." (*Gilbert v. Homar, supra*, 520 U.S. at

p. 930 [due process clause did not entitle state university employee to notice and hearing prior to his suspension without pay based on his arrest on drug-related charges].)

In *Cleveland Board of Education v. Loudermill, supra,* 470 U.S. at page 541 [105 S.Ct. 1487], the United States Supreme Court considered an Ohio state law that entitled a dismissed public employee to a full postdismissal administrative hearing and judicial review. (*Id.* at p. 545.) Consequently, "[t]he only question [was] what steps were required before the termination took effect." (*Ibid.*) The high court concluded that "all the process that is due is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures as provided by the Ohio statute." (*Id.* at pp. 547–548.) The court explained: "[T]he pretermination 'hearing,' though necessary, need not be elaborate. [The United States Supreme Court has] pointed out that '[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.' *Boddie* v. *Connecticut,* 401 U.S., at 378 [91 S.Ct., at 786]. See *Cafeteria Workers* v. *McElroy,* 367 U.S. 886, 894–895 [6 L.Ed.2d 1230, 81 S.Ct. 1743, 1748] (1961). In general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action. *Mathews* v. *Eldridge* [(1976)] 424 U.S. [319,] 343 [47 L.Ed.2d 18, 96 S.Ct. 893, 907]." (*Id.* at p. 545.)

The high court determined that in circumstances providing for a full hearing posttermination, the pretermination hearing "should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. See *Bell* v. *Burson* [(1971)] 402 U.S. [535,] 540 [29 L.Ed.2d 90, 91 S.Ct., 1586, 1590]." (*Cleveland Board of Education v. Loudermill, supra,* 470 U.S. at pp. 545–546.) "The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. See Friendly, 'Some Kind of Hearing,' 123 U.Pa.L.Rev. 1267, 1281 (1975). The tenured public employee is entitled to oral or written notice of the charges against him, *an explanation of the employer's evidence,* and an opportunity to present his side of the story. [Citations.] To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." (*Id.* at p. 545, italics added.) The court made clear that its holding "rest[ed] in part on the provisions in Ohio law for a full post-termination hearing." (*Id.* at p. 546.) It observed that "the existence of post-termination procedures is relevant to the necessary scope of pretermination procedures." (*Id.* at p. 547, fn. 12.)

Subsequently, in *Brock v. Roadway Exp., Inc.* (1987) 481 U.S. 252, 255 [95 L.Ed.2d 239, 107 S.Ct. 1740], the United States Supreme Court considered

the issue whether the failure of section 405 of the Surface Transportation Assistance Act of 1982 (96 Stat. 2157, 49 U.S.C. Appen. § 2305), which protects employees in the commercial motor transportation industry from retaliatory discharges, "to provide for an evidentiary hearing before temporary reinstatement [of a discharged employee] deprives the employer of procedural due process under the Fifth Amendment." (*Brock, supra,* 481 U.S. at p. 255.) Under the statute, the employer was entitled to "request an evidentiary hearing and a final decision from the Secretary [of Labor], but this request [did] not operate to stay the preliminary order of reinstatement." (*Ibid.*)

The Supreme Court in *Brock* held that "the Secretary's preliminary reinstatement order was unconstitutionally imposed in this case because [the employer] was not informed of the relevant evidence supporting [the employee's] complaint and therefore was deprived of an opportunity to prepare a meaningful response." (*Brock v. Roadway Exp., Inc., supra,* 481 U.S. at p. 268.) The high court explained: "In *Loudermill,* the Court considered the temporary deprivation of a state government employee's right not to be discharged without cause, indicating that the employee was entitled to 'oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story' before the temporary discharge took effect, though a full evidentiary hearing including the right to confront and cross-examine adverse witnesses could be delayed for a reasonable period. [*Cleveland Board of Education v. Loudermill, supra,*] 470 U.S., at 546 [105 S.Ct., at 1495]. Similarly, in *Arnett* v. *Kennedy,* 416 U.S. 134 [40 L.Ed.2d 15, 94 S.Ct. 1633] (1974), the Court upheld the procedures upon which a Federal Government employee had been temporarily discharged, where those procedures did not provide for a full evidentiary hearing until after the discharge became effective but did afford the employee 'advance written notice of the reasons for his proposed discharge and the materials on which the notice [was] based,' as well as 'the right to respond to the charges both orally and in writing, including the submission of affidavits.' *Id.,* at 170 [94 S.Ct., at 1652] (opinion of Powell, J.). These cases reflect that the constitutional requirement of a meaningful opportunity to respond before a temporary deprivation may take effect entails, at a minimum, the right to be informed not only of the nature of the charges but also of *the substance of the relevant supporting evidence.* If the employer is not provided this information, the procedures implementing § 405 contain an unacceptable risk of erroneous decisions." (*Id.* at pp. 264–265, italics added.) The court concluded: "[M]inimum due process for the employer in this context requires notice of the employee's allegations, *notice of the substance of the relevant supporting evidence* , an opportunity to submit a written response, and an opportunity to meet with the investigator and present

statements from rebuttal witnesses. The presentation of the employer's witnesses need not be formal, and cross-examination of the employee's witnesses need not be afforded at this stage of the proceedings." (*Id.* at p. 264, italics added.)

■ The essence of procedural due process is notice and an opportunity to respond. (*Cleveland Board of Education v. Loudermill, supra,* 470 U.S. 532, 546.) "The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.' " (*Memphis Light, Gas and Water Division v. Craft* (1978) 436 U.S. 1, 14 [56 L.Ed.2d 30, 98 S.Ct. 1554], fn. omitted.) The content of notice depends on "appropriate accommodation of the competing interests involved. *Cafeteria Workers* v. *McElroy, supra,* 367 U.S. at 895 [81 S.Ct. at 1748]; *Morrissey* v. *Brewer, supra,* 408 U.S. at 481 [92 S.Ct. at 2600]." (*Goss v. Lopez* (1975) 419 U.S. 565, 579, 581 [42 L.Ed.2d 725, 95 S.Ct. 729] [due process requires that a student facing temporary suspension be given "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story"].)

■ A determination whether administrative procedures "are constitutionally sufficient requires analysis of the governmental and private interests that are affected. *Arnett* v. *Kennedy, supra,* 416 U.S., at 167–168 [94 S.Ct., at 1650–1651] (Powell, J., concurring in part); *Goldberg* v. *Kelly* [(1970)] 397 U.S. [254,] 263–266 [25 L.Ed.2d 287, 90 S.Ct., at 1018–1020]; *Cafeteria Workers* v. *McElroy, supra,* 367 U.S., at 895 [81 S.Ct., at 1748–1749]." (*Mathews v. Eldridge* (1976) 424 U.S. 319, 334 [47 L.Ed.2d 18, 96 S.Ct. 893].) The government has a strong interest " 'in terminating law enforcement officers who are of questionable moral character, and in doing so in an expeditious, efficient, and financially unburdensome manner.' (*Murden* [v. *County of Sacramento* (1984)] 160 Cal.App.3d [302,] 311 [206 Cal.Rptr. 699]; see *Gilbert* [v. *Homar* (1997)] 520 U.S. [924,] 932–933 [138 L.Ed.2d at p. 126, 117 S.Ct. at p. 1813].) " (*Holmes v. Hallinan* (1998) 68 Cal.App.4th 1523, 1532 [81 Cal.Rptr.2d 174]; see *Gilbert v. Homar, supra,* 520 U.S. at p. 932 [state university has an interest in "preserving public confidence in its police force"]; see also *Cleveland Board of Education v. Loudermill, supra,* 470 U.S. at pp. 543, 546 [government has an interest in the expeditious removal of unsatisfactory employees].) This governmental interest must be considered in determining what process is due. (See *Civil Service Assn. v. City and County of San Francisco* (1978) 22 Cal.3d 552, 556 [150 Cal.Rptr. 129]; see also *Cleveland Board of Education v. Loudermill, supra,* 470 U.S. at p. 541 ["once it is determined that the Due Process Clause applies, 'the question remains what process is due' "].)

We reject appellant's contention that the word "materials" as used in *Skelly* means each and every document identified in the Chief's Case was required to be produced prior to his pretermination hearing in order to satisfy due process. Even the regulation in *Arnett*, upon which *Skelly* relied, allowed for "*extracts*" from witness statements, documents, and investigative reports. (*Arnett v. Kennedy*, *supra*, 416 U.S. at p. 143, fn. 9.) The Chief's Case contains verbatim excerpts of his telephone conversations with an unidentified female in which appellant was provided with two license plate numbers, the results of internal DMV and Department of Justice journal searches showing inquiries into those vehicle license plate numbers from specified terminals using an operation number that corresponded with appellant's employee number, and excerpts from other relevant documents, including transcribed interviews. The Chief's Case together with the other materials made available to appellant prior to his pretermination hearing adequately provided "an explanation of the employer's evidence" (*Cleveland Board of Education v. Loudermill*, *supra*, 470 U.S. at p. 546) and "notice of the substance of the relevant supporting evidence" (*Brock v. Roadway Exp., Inc.*, *supra*, 481 U.S. at p. 264), sufficient to enable appellant to adequately respond at the pretermination stage. Appellant has failed to show that respondents did not substantially comply with the pretermination requirements of *Skelly*.

■ Constitutional principles of due process do not create general rights of discovery. (See *Holmes v. Hallinan*, *supra*, 68 Cal.App.4th at p. 1534 [peace officer was not entitled to discovery before termination]; see also *Mohilef v. Janovici* (1996) 51 Cal.App.4th 267, 302 [58 Cal.Rptr.2d 721] [no basic constitutional right to pretrial discovery in administrative proceedings]; cf. *Gray v. Netherland* (1996) 518 U.S. 152, 169–170 [135 L.Ed.2d 457, 116 S.Ct. 2074] [habeas corpus petitioner's notice of evidence claim would require the adoption of a new constitutional rule]; *Weatherford v. Bursey* (1977) 429 U.S. 545, 559 [51 L.Ed.2d 30, 97 S.Ct. 837] ["no general constitutional right to discovery in a criminal case"].) We disagree with appellant's suggestion that the mere fact the city provided him with additional materials following his pretermination hearing proves a *Skelly* violation. "What *Skelly* requires is unambiguous warning that matters have come to a head, coupled with an explicit notice to the employee that he or she now has the opportunity to engage the issue and present the reasons opposing such a disposition." (*Coleman v. Regents of University of California* (1979) 93 Cal.App.3d 521, 525–526 [155 Cal.Rptr. 589].)

■ Appellant further complains that he "knows, even if the City will not admit it, that even if the alleged [mis]conduct [had] occurred, he would not have been terminated had it occurred in a different context." However, due process does not require the city to select, as the basis for its disciplinary action, instances of misconduct that might be more difficult to prove or that might compromise other governmental investigations or prosecutions when it

has clear-cut evidence of misconduct that itself justifies dismissal. Appellant did not present evidence that misuse of CLETS or DMV records would be an insufficient justification for dismissing him.

By statute, CLETS must "be used exclusively" for official business. (§ 15153.) Knowingly accessing and without permission making use of any data from a computer system is a crime. (Pen. Code, § 502, subd. (c)(2).) The willful, unauthorized disclosure of information from any DMV record to any person is a crime. (Veh. Code, § 1808.45.) Apparently, appellant signed employment forms indicating that he understood misuse of public record and CLETS information made him subject to immediate dismissal.

Since this is a writ proceeding, appellant bore the burden of pleading and proving that his suspected involvement in the hostess bar scandal was the real reason for the intended disciplinary action, as opposed to the Department's stated reasons, and the materials received prior to his *Skelly* hearing were not sufficient to provide him an opportunity to meaningfully respond at the pretermination stage. Appellant failed to make an adequate showing.

Our decision that the pretermination procedures were constitutionally sufficient partially rests on the city's provision of a full and fair posttermination hearing since "certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." (*Cleveland Board of Education v. Loudermill, supra,* 470 U.S. at p. 541.) "The minimal due process rights required by *Skelly prior* to discharge are merely anticipatory of the full rights which *are* accorded to the employee *after* discharge." (*Kirkpatrick v. Civil Service Com.* (1978) 77 Cal.App.3d 940, 945 [144 Cal.Rptr. 51].) Appellant recognizes that "[t]his case is *not* about the merits of the City's case for terminating [him]" and "that case is yet to be litigated and decided in the administrative appeal process." Appellant must still be afforded a constitutionally adequate posttermination evidentiary hearing. (See *Cleveland Board of Education v. Loudermill, supra,* 470 U.S. at pp. 545–546.)

### 2. *Due Process Does Not Disqualify Legal Advisor to the City*

Citing *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017 [119 Cal.Rptr.2d 341, 45 P.3d 280], appellant asserts that the city's legal advisor, Marc Hynes, must be "recused." Attorney Hynes has performed various legal services for the city over the years, including serving as interim city attorney in 1990.

*Haas* involved "a due process challenge to the manner in which some counties select temporary administrative hearing officers." (*Haas v. County of San Bernardino, supra,* 27 Cal.4th at p. 1020.) The Supreme Court determined that the temporary hearing officer in that case had an impermissible pecuniary interest that required disqualification in that the government unilaterally selected and paid the officer on an ad hoc basis and the officer's income from future adjudicative work depended entirely on the government's goodwill. (*Id.* at pp. 1024, 1031.) Appellant maintains that the role of legal advisor in this case is analogous to the role of the temporary hearing officer in *Haas*.

This court does not find the analogy apt and is not persuaded. Appellant is appealing the disciplinary action to the personnel board, not to Attorney Hynes. There has been no showing that Attorney Hynes is an adjudicator on the merits of the disciplinary action or tantamount to one. Insofar as appellant has a concern that Hynes might give the personnel board legal advice adverse to his interests at the posttermination hearing, it is pure speculation. Hynes's role appears to be limited to that of a professional legal advisor, who presumably is familiar with applicable law and would be seeking to protect the city from civil liability for misapplications of the law.

### D. *Public Safety Officers Procedural Bill of Rights Act*

#### 1. *Section 3303, Subdivision (g)*

 Subdivision (g) of section 3303 mainly concerns the recording of an interrogation of a public safety officer under investigation by the officer's employing public safety department. It also provides: "The public safety officer shall be entitled to a transcribed copy of any notes made by a stenographer or to *any reports or complaints* made by investigators or *other persons*, except those which are deemed by the investigating agency to be confidential. No notes or reports that are deemed to be confidential may be entered in the officer's personnel file." (*Ibid.,* italics added.)

Appellant contends that the city failed to comply with section 3303, subdivision (g), by "failing to provide him with all of the reports and complaints and underlying data giving rise to the 'Chief's Case' report after he was subjected to an administrative interrogation." Citing *San Diego Police Officers Assn. v. City of San Diego* (2002) 98 Cal.App.4th 779 [120 Cal.Rptr.2d 609] (hereinafter *San Diego*), appellant claims to be entitled to "all the reports, complaints, and underlying data concerning the misconduct that was the subject of that investigation, including all of the reports and documents referred to and discussed in that report which were in turn considered and relied upon by the Department in taking action against [him]."

Appellant maintains respondents' assertion that the disciplinary action has a narrow focus is "belied by the memorandum issued by the Chief" that indicated he was "placed on leave as a result of the Korean Hostess Bar investigation" "and by the innumerable references and allegations in the 'Chief's Case' " that indicated he had "assisted the owners and operators of the Korean Hostess Bars in the prostitution business." In addition, he insists that there is no factual basis for accepting the city's confidentiality claims and any confidentiality concern regarding specific materials could be remedied by redaction.

Respondents seek to distinguish *San Diego,* asserting that it did not consider the issues of disclosing criminal investigation records, records of outside agencies, or confidential records regarding other officers. Respondents contend that nothing in the Act entitles appellant to "criminal records compiled by any outside agency, including the FBI or Grand jury." They assert that the city provided appellant with all records to which he was entitled as of July 2003, a date prior to any administrative appeal hearing, which still had not been held at the time of appellate briefing.

Section 3303, subdivision (g), is part of the Public Safety Officers Procedural Bill of Rights Act. (See § 3300.) "Section 3303 prescribes protections that apply when a peace officer is interrogated in the course of an administrative investigation that might subject the officer to punitive action, such as 'dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment.' (*Ibid.*) Inherent in this protective scheme is a recognition that such investigations are a necessary component of employment in law enforcement." (*Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 574 [273 Cal.Rptr. 584, 797 P.2d 608] [hereinafter *Pasadena*].)

"To ensure fair treatment of an officer during an internal affairs interrogation, section 3303 requires that the employing agency notify the officer to be interrogated of the identity of the interrogating officers (§ 3303, subd. (b)), and of 'the nature of the investigation prior to any interrogation' (§ 3303, subd. (c)). It also prohibits abusive interrogation techniques. (§ 3303, subds. (a) [interrogation to be conducted at a reasonable hour], (b) [no more than two interrogators], (d) [length of the interrogation session not to be unreasonable; subject must be allowed to attend to physical necessities], and (e) [no abusive language, promises or threats].) If the interrogation focuses on matters likely to result in punitive action against the peace officer, section 3303 allows the officer to designate a representative to be present at the interrogation, provided that the representative is not someone subject to the

same investigation. (§ 3303, subd. (h) [now subd. (i)].) If criminal charges are contemplated, section 3303 requires immediate advisement of the so-called *Miranda* rights. (§ 3303, subd. (g) [now subd. (h)]; *Lybarger v. City of Los Angeles* [(1985)] 40 Cal.3d 822, 829.)" (*Pasadena, supra,* 51 Cal.3d at p. 574, fn. omitted.)

In *San Diego, supra,* 98 Cal.App.4th 779, an appellate court construed the terms "reports" and "complaints" in section 3303, subdivision (g), to include investigators' raw notes and tape-recorded interviews of witnesses. (*Id.* at pp. 782–785.) That court framed the issue as "whether the Legislature intended that an officer have access only to the final written report of the investigating officer and to written complaints by third persons, or whether it also intended to allow an officer to have access to the underlying data on which the final report is based." (*Id.* at p. 783.)

Despite the fact that section 3303 concerns only the interrogation of an officer under investigation, the appellate court in *San Diego* focused on the ability of officers to respond to administrative charges of misconduct. Noting that a public safety officer is entitled to an administrative appeal from punitive action under the Bill of Rights Act (§ 3304, subd. (b)), the court reasoned: "If City is correct that an accused officer is entitled to only the written complaints filed by third persons and the final written report prepared by investigators, but not to the underlying materials that might tend to show the complaints or reports were inaccurate, incomplete, or subject to impeachment for bias, the officer's ability to establish a defense at the administrative hearing could be hampered and the rights protected by the Act undermined." (*San Diego, supra,* 98 Cal.App.4th at p. 784.)

The appellate court found support for its analysis in the Supreme Court's *Pasadena* decision, stating: "The *Pasadena* court also recognized that '[s]ome of the rights that the Act affords peace officers resemble those available in a criminal investigation,' and concluded that because the Act appeared to borrow from the criminal law procedural rules, the criminal law approach to the timing of discovery (which gives no right to discovery until after the charges have been filed) was a persuasive reason for concluding that an accused officer was not entitled to discovery until after he or she was interrogated. (*Pasadena, supra,* 51 Cal.3d at pp. 578–579.)" (*San Diego, supra,* 98 Cal.App.4th at p. 784, fn. omitted.) The *San Diego* appellate court proceeded to observe: "A criminal defendant would be entitled to raw notes or tape-recorded statements of witnesses preserved by the police. (See generally *Thompson v. Superior Court* (1997) 53 Cal.App.4th 480, 484–487 [61 Cal.Rptr.2d 785] [raw notes can constitute ' "reports of the statements" of

witnesses' disclosable under Pen. Code, §§ 1054.1, subd. (f) and 1054.3, subd. (a)]; *In re Gary G.* (1981) 115 Cal.App.3d 629, 639–642 [171 Cal.Rptr. 531] [no duty to preserve notes but investigators' raw notes should be turned over if in existence when discovery order entered].)" (*San Diego, supra,* 98 Cal.App.4th at pp. 784–785.) The appellate court then concluded that "[b]ecause the Act provides an officer with protections similar to those provided criminal defendants by criminal law procedural and discovery rules," an officer was entitled to "protections similar to those enjoyed by criminal defendants, including the rights to raw notes and tape-recorded statements of witnesses preserved by City" under section 3303, subdivision (g). (*San Diego,* at p. 785.)

We respectfully disagree with the conclusions reached in *San Diego. Pasadena, supra,* 51 Cal.3d at pages 568–569, considered only the "narrow issue" "whether [former] subdivision (f) [now (g)] manifests a legislative intent to grant preinterrogation discovery rights to a peace officer who is the subject of an internal affairs investigation." The Supreme Court held that "the Legislature intended subdivision (f) to require law enforcement agencies to disclose reports and complaints to an officer under an internal affairs investigation only *after* the officer's interrogation." (*Id.* at p. 579.)

The appellate court in *San Diego* extrapolated from the Supreme Court's reasoning in *Pasadena* to infer a legislative intent to provide broad criminal-discovery-like rights to officers under investigation, which is not apparent from the language of section 3303. "Under well-established rules of statutory construction, we must ascertain the intent of the drafters so as to effectuate the purpose of the law. [Citation.] Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context. [Citation.] When statutory language is clear and unambiguous, ' "there is no need for construction and courts should not indulge in it." ' [Citation.]" (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268 [121 Cal.Rptr.2d 203, 47 P.3d 1069].)

In addition, the rule of statutory construction that requires courts to construe statutes to avoid constitutional infirmities does not come into play unless there is an ambiguity that raises serious constitutional questions. (See *People v. Anderson* (1987) 43 Cal.3d 1104, 1146 [240 Cal.Rptr. 585, 742 P.2d 1306].) The fact that due process may require sufficient notice of the facts to enable an officer to meaningfully defend himself or herself *if* the officer is administratively charged does not require expansive judicial construction of the phrase "any reports or complaints made by investigators or other persons" at the earlier investigation stage.

 In the context of an investigation, a "report" would be generally defined as a detailed account or statement (Merriam-Websters Collegiate Dict. (10th ed. 2001) p. 990) and a "complaint" would be generally defined as "a formal allegation against a party" (*id.* at p. 234). Both "report" and "complaint" suggest a more formal presentation than the raw or original source materials from which a report may be drawn. This construction is consistent with the objectives of the Bill of Rights Act.

"The purpose of the Act is 'to maintain stable employer-employee relations and thereby assure effective law enforcement.' (*Lybarger v. City of Los Angeles* (1985) 40 Cal.3d 822, 826 [221 Cal.Rptr. 529, 710 P.2d 329]; § 3301.) The Act requires that law enforcement agencies throughout the state afford minimum procedural rights to their peace officer employees. (§ 3300 et seq.; *Baggett v. Gates* (1982) 32 Cal.3d 128, 135 [185 Cal.Rptr. 232, 649 P.2d 874]; *White v. County of Sacramento* (1982) 31 Cal.3d 676, 679 [183 Cal.Rptr. 520, 646 P.2d 191].)" (*Pasadena, supra,* 51 Cal.3d at p. 572, fn. omitted.) "Although notions of fundamental fairness for police officers underlie the Act, a number of its provisions also reflect the Legislature's recognition of the necessity for internal affairs investigations to maintain the efficiency and integrity of the police force serving the community." (*Ibid.*)

"Protection of peace officers from abusive or arbitrary treatment in their employment is the essence of the Act." (*Pasadena, supra,* 51 Cal.3d at p. 577.) In *Pasadena,* the touchstone of the Supreme Court's analysis was "fundamental fairness." (*Id.* at p. 578.) The court stated: "Because entitlement to *preinterrogation* discovery is neither apparent from the language of subdivision (f) nor fundamental to the fairness of an internal affairs investigation, and because such mandatory discovery might jeopardize public confidence in the efficiency and integrity of its police force, we decline to engraft such a right onto the Act." (*Id.* at p. 579.) It explained: "Unlike other protections set forth in the Act, a right to preinterrogation discovery is not essential to the fundamental fairness of an internal affairs investigation. Indeed, the right to discovery *before interrogation and before charges have been filed* . . . is without precedent." (*Id.* at p. 578.)

The main purpose of section 3303 is to govern the conduct of an interrogation of an officer who is under investigation, thereby preventing abusive tactics. The only "notes" to which such officer is expressly entitled under section 3303, subdivision (g), are the "notes made by a stenographer," who was implicitly present at the officer's interrogation. Fair treatment of such officer does not require that all the material amassed in the course of the investigation, such as raw notes, written communications, records obtained,

and interviews conducted, be provided to the officer following the officer's interrogation. Nothing in the Act's language or legislative history reveals a legislative intent to provide an officer who is the subject of an administrative internal affairs investigation with broad statutory discovery rights similar to those held by criminal defendants. As the Supreme Court observed in *Pasadena*, "[s]ubdivision (f) [now (g)] defines only disclosure requirements incident to an *investigation*; it does not address an officer's entitlement to discovery in the event he or she is administratively *charged* with misconduct." (*Pasadena, supra,* 51 Cal.3d at p. 575, italics in original.)

 The express language of section 3303, subdivision (g), however, does encompass reports made by persons other than agency's investigators. Consequently, we cannot agree that the mere fact that a report originated from a criminal investigation, either by the employing public safety department or an outside agency, necessarily excuses the department from making such report available where it has been expressly made part of the department's internal affairs investigation of an officer. While respondents correctly point out that section 3303 does not apply "to an investigation concerned *solely* and directly with alleged criminal activities" (§ 3303, subd. (i), italics added), the Department's investigation at issue here was an internal affairs investigation, not exclusively a criminal investigation, and, therefore, the investigation was subject to section 3303, subdivision (g).

 Respondents also maintain that appellant Gilbert is not entitled to records of other agencies' investigations because the Department "had little or no involvement in those outside agency investigations" and it "does not possess those records" or "have any right to them." Again, nothing in section 3303, or the cases relied on by respondents, absolves a department from providing any report expressly included in its investigation merely because the report arose in another agency's investigation or because the original document is physically in the possession of that outside agency. Those cases merely indicate that section 3303 is inapplicable when the interrogator is not the officer's "commanding officer, or any other member of the employing public safety department" (§ 3303) or when the officer is the subject of an independent investigation or interview by an outside agency.

In *Seligsohn v. Day* (2004) 121 Cal.App.4th 518, 520–521 [16 Cal.Rptr.3d 909], complaints against two police officers employed by a community college were filed with the college's office of affirmative action. The appellate court determined that no production of materials pursuant to section 3303, subdivision (g), was required where the interrogation of police officers was *not* "undertaken by the 'commanding officer, or any member of the

employing public safety department' " but rather by an associate dean of the college who coordinated the college's Office of Affirmative Action and a private investigator employed by the associate dean. (121 Cal.App.4th at pp. 521, 524.) However, the court concluded that section 3305, entitling a public safety officer to read any adverse comment entered in his personal file, applied to the complaints against the officers, copies of which were sent to the officers' superior. (121 Cal.App.4th at pp. 521, 531.)

In *Alhambra Police Officers Assn. v. City of Alhambra Police Dept.* (2003) 113 Cal.App.4th 1413, 1417 [7 Cal.Rptr.3d 432], for example, the Los Angeles County Sheriff's Department conducted an independent criminal investigation of Officer Marquez, who was employed by the Alhambra Police Department, and, in the course of that criminal investigation, the sheriff's department interviewed another Alhambra officer, Officer Torrance. The appellate court determined that the Act had no application to the interview of Officer Torrance because the sheriff's department was an outside agency and was *not* acting in concert with, or as an agent of, the police department. (*Id.* at pp. 1421–1422.)

In *California Correctional Peace Officers Assn. v. State of California* (2000) 82 Cal.App.4th 294 [98 Cal.Rptr.2d 302], the reviewing court found that the State Department of Justice (DOJ) had acted in concert with the California Department of Corrections (CDC) when the DOJ investigated alleged misconduct by state correctional officers and interrogated them[4] and, consequently, the protections of section 3303, subdivision (g), applied even though the DOJ was not their employer. (82 Cal.App.4th at p. 307.) Even in that case, the court recognized that "[s]ection 3309.5 authorizes injunctive relief only as to the employing public safety department, which is the CDC" and to the extent the injunction issued by the lower court included the DOJ, an outside agency, it was unauthorized by section 3309.5. (82 Cal.App.4th at p. 312.)

---

[4] The evidence in *California Correctional Peace Officers Assn. v. State of California, supra,* 82 Cal.App.4th 294, established that the CDC requested the assistance of the DOJ to investigate the alleged wrongdoing and the agencies were in effect conducting a joint investigation. (*Id.* at pp. 299, 307.) The reviewing court reasoned: "The CDC did not merely order the correctional officers to cooperate with the DOJ investigation, but delivered interviewees to DOJ investigators, and threatened them with arrest and/or discipline if they asserted their rights during interrogation by DOJ agents. Until they had given statements, correctional officers were prevented from leaving prison grounds by their employer. Hallway exits and interrogation rooms were guarded by the CDC. The interviews took place during work hours or immediately thereafter, on work premises. Upon being told by DOJ interrogators that an officer was not providing satisfactory responses during the interrogation, CDC employees threatened the officers with criminal and disciplinary sanctions. Under these circumstances, the CDC and the DOJ must be considered to have been acting in concert." (*Id.* at p. 307.) The appellate court acknowledged that if "the DOJ conducted a substantially independent investigation, the provisions of section 3303 would have been inapplicable." (*Id.* at p. 312, fn. omitted.)

Appellant Gilbert has not sought relief against the FBI or any other outside agency. The Department is plainly subject to the disclosure requirements of section 3303 since it interrogated appellant in the course of its internal affairs investigation.

We find respondents' lack of possession argument somewhat perplexing since the documents sought by appellant were incorporated into the Chief's Case. The reasonable inference from reading the Chief's Case is that the Department had access to the reports incorporated into its investigation. Under section 3303, subdivision (g), the Department was generally required to provide *any* report by *any* person following appellant's interrogation. Logically, any report or complaint included in a department's internal affairs investigation of its officer is covered by section 3303, subdivision (g), if the department has possession or control of the document or reasonable access to it. (Cf. *In re Littlefield* (1993) 5 Cal.4th 122, 135 [19 Cal.Rptr.2d 248, 851 P.2d 42] [prosecution's duty to disclose].) Presumably, an accurate copy would suffice. The only statutory exception to the disclosure requirement in section 3303, subdivision (g), is for items "deemed by the investigating agency to be confidential."

Interestingly, respondents have not expressly claimed that any document sought by appellant was acquired in confidence from an outside agency. Instead, they assert on appeal that appellant is not entitled to the confidential personnel records of other officers, citing Penal Code sections 832.7 and 832.8 and *San Diego Police Officers Assn. v. City of San Diego Civil Service Com.* (2002) 104 Cal.App.4th 275 [128 Cal.Rptr.2d 248].

Penal Code section 832.7 provides in pertinent part: "Peace officer or custodial officer personnel records and records maintained by any state or local agency pursuant to Section 832.5, or information obtained from these records, are confidential and shall not be disclosed in any criminal or civil proceeding except by discovery pursuant to Sections 1043 and 1046 of the Evidence Code."[5] Penal Code section 832.8 defines "personnel records," as used in Penal Code section 832.7, to mean "any file maintained under that individual's name by his or her employing agency" and containing records

---

[5] Penal Code section 832.5 states in part: "Complaints and any reports or findings relating to these complaints shall be retained for a period of at least five years. All complaints retained pursuant to this subdivision may be maintained either in the peace or custodial officer's general personnel file or in a separate file designated by the department or agency as provided by department or agency policy, in accordance with all applicable requirements of law." "Both the individual officer [whose records are involved] and the law enforcement agency are entitled to claim the confidential personnel records privilege of Penal Code section 832.7." (*Abatti v. Superior Court* (2003) 112 Cal.App.4th 39, 57 [4 Cal.Rptr.3d 767].)

relating to specified matters, including employee discipline, "[c]omplaints, or investigations of complaints, concerning an event or transaction in which he or she participated, or which he or she perceived, and pertaining to the manner in which he or she performed his or her duties," and "[a]ny other information the disclosure of which would constitute an unwarranted invasion of personal privacy." (Pen. Code, § 832.8, subds. (d), (e), and (f).)

In *San Diego Police Officers Assn. v. City of San Diego Civil Service Com.,* *supra,* 104 Cal.App.4th at page 287, the appellate court, after extensive analysis, held that "section 832.7 provides that peace officer personnel records, as defined in section 832.8, are confidential." It disagreed with *Bradshaw v. City of Los Angeles* (1990) 221 Cal.App.3d 908 [270 Cal.Rptr. 711], which had held that Penal Code section 832.7 only limits disclosure in civil and criminal proceedings (*Bradshaw, supra,* at pp. 916, 919), and concluded that Penal Code section 832.7 recognizes the confidentiality of peace officer personnel records regardless of the context in which the records are sought. (*San Diego Police Officers Assn. v. City of San Diego Civil Service Com., supra,* 104 Cal.App.4th at pp. 284–285.)

 While we find the reasoning of *San Diego Police Officers Assn. v. City of San Diego Civil Service Com.* sound, we have no way to evaluate the documents sought by appellant since they are not part of the record before us. More significantly, section 3303, subdivision (g), empowers the investigating agency to deem reports confidential and excepts items so designated from the agency's disclosure obligation. Nothing in the section limits an investigating agency's power to designate reports confidential to materials protected by statutory privilege. Logically, an investigating agency exercising its power under section 3303, subdivision (g), could choose to deem portions of a report confidential, which in effect is what the Department impliedly did in this case by providing only limited disclosures in the Chief's Case. In response to the writ petition, the City of Sunnyvale asserted that "the peripheral documents and materials to which [Gilbert] claims he has been denied access are covered by the exception for confidential materials."

 Under section 3303, subdivision (g), the repercussion of deeming an item confidential is that it may not be entered in the officer's personnel file. The implication is that the employing department may not make adverse personnel decisions concerning the officer based on reports, or the portions thereof, deemed confidential and not made available to the officer. Section 3305 provides: "No public safety officer shall have any comment adverse to his interest entered in his personnel file, or any other file used for any

personnel purposes by his employer, without the public safety officer having first read and signed the instrument containing the adverse comment indicating he is aware of such comment, except that such entry may be made if after reading such instrument the public safety officer refuses to sign it." Section 3306 establishes a public safety officer's right to file a written response to any adverse comment entered in his personnel file. Section 3306.5 generally requires an employer, upon request, to permit an officer to inspect personnel files used to make personnel determinations concerning that officer, including termination or other disciplinary action.

It is unreasonable to suppose that the Legislature intended section 3303, subdivision (g), to afford an officer under investigation far-reaching disclosure rights, akin to the statutory discovery rights in criminal prosecutions, following an administrative interrogation of the officer when the Act does not expressly so provide but rather gives the investigating agency power to deem reports confidential, excludes such confidential items from the duty to disclose, and provides no mechanism for challenging such designation. The more reasonable interpretation, in light of the other features of section 3303 and other provisions of the Bill of Rights Act, is that the minimal rights of disclosure included in subdivision (g) were intended to prevent grossly abusive interrogation tactics and protect an officer's personnel file.

Although appellant Gilbert complains that "[t]he City never asserted such a [confidentiality] justification for withholding information from Gilbert until *after* he filed his writ petition," appellant has not carried his burden of pleading and proving that the Department had a present duty under section 3303, subdivision (g), to disclose the additional materials he seeks in this proceeding (see *California Correctional Peace Officers Assn. v. State Personnel Bd., supra,* 10 Cal.4th 1153–1154) since, as we have indicated, the right to deem reports confidential under section 3303, subdivision (g), rests with the officer's employing department. "Two basic requirements are essential to the issuance of the writ: (1) A clear, present and usually ministerial duty upon the part of the respondent [citations]; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty [citation]." (*People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 491 [96 Cal.Rptr. 553, 487 P.2d 1193].)

While appellant Gilbert has not established entitlement to mandamus relief to force disclosure under section 3303, subdivision (g), our conclusions regarding the scope of section 3303 in no way affects or limits his rights of

due process in the administrative appeal process challenging his termination. (See *Cleveland Board of Education v. Loudermill, supra,* 470 U.S. at p. 541.)

### 2. *Other Remedies Under the Bill of Rights Act*

Appellant maintains that he is entitled to additional statutory remedies under the Act because respondents failed to provide him with all the data and materials underlying the Chief's Case following his interrogation, "insisting that he participate in a Personnel Board hearing without having received those materials," and, thereby, depriving him of a meaningful administrative appeal. Specifically, he seeks an award of backpay commencing March 1, 2003, and continuing until respondents comply with the Act, attorney fees, civil penalties, and an order prohibiting the Department from taking punitive action against him.

Section 3309.5, subdivision (d), provides in part: "In any case where the superior court finds that a public safety department has violated any of the provisions of this chapter, the court shall render appropriate injunctive or other extraordinary relief to remedy the violation and to prevent future violations of a like or similar nature, including, but not limited to, the granting of a temporary restraining order, preliminary, or permanent injunction prohibiting the public safety department from taking any punitive action against the public safety officer." Assuming backpay in certain circumstances would be appropriate relief under section 3309.5 (*Henneberque v. City of Culver City* (1985) 172 Cal.App.3d 837, 842, 844 [218 Cal.Rptr. 704] [backpay authorized]; see *Williams v. City of Los Angeles* (1988) 47 Cal.3d 195, 203–204 [252 Cal.Rptr. 817, 763 P.2d 480] ["a trial court has broad discretion in fashioning a remedy for a violation of the act," "no basis for a complete ban on exclusion of evidence as a remedy"]), we cannot conclude the superior court acted improperly in denying a backpay remedy in this case. As discussed above, appellant has not established that, under section 3303, subdivision (g), he is entitled to any remaining document to which he has been denied access.

As to the documents provided by the city attorney in June 2003 and itemized in her letter of June 23, 2003, appellant has not shown that each constituted a "report" or "complaint" under section 3303, subdivision (g), as this court has interpreted those terms. Appellant's employee statement forms, for example, do not appear to be reports or complaints. In addition, appellant has not presented evidence establishing that Department provided untimely access to any report or complaint ultimately provided in June 2003. For

example, the Chief's Case indicated that the Department's criminal investigation was still active. Consequently, at the time the Chief's Case issued, the criminal investigation report (CR 02-11786) was still impliedly confidential.

Appellant received the Chief's Case, an extremely comprehensive report that identified the source materials in detail and included excerpts of telephone conversations and transcribed statements, and 10 audiotapes following his interrogation. The record does not show that appellant's former attorneys, who represented him at the *Skelly* hearing on February 20, 2003, requested, but were denied, access to any nonconfidential document identified in the Chief's Case. While section 3303, subdivision (g), entitled appellant access to all nonconfidential reports and complaints, the appellate record indicates that appellant did not seek disclosure of additional materials until after the *Skelly* hearing. The appellate record reflects that appellant's current attorney requested additional materials from the Sunnyvale city attorney in a June 9, 2003 letter and received certain materials, including the crime investigation report (CR 02-11786) and a redacted FBI undercover report, that month.

Section 3303, subdivision (g), does not specify any time frame for disclosure and, as mentioned above, the California Supreme Court has determined no disclosure is required before interrogation. (*Pasadena, supra,* 51 Cal.3d at p. 579 [273 Cal. Rptr. 584, 797 P.2d 608].) Consequently, a reasonable, postinterrogation time frame is implied. (See *Dougery v. Bettencourt* (1931) 214 Cal. 455, 465 [6 P.2d 499]; cf. *In re Steele* (2004) 32 Cal.4th 682, 692, fn. 2 [10 Cal.Rptr.3d 536, 85 P.3d 444].) Where a department does not provide disclosure upon informal request, an interrogated officer may seek court enforcement of the disclosure required by section 3303, subdivision (g), pursuant to section 3309.5. Upon an adequate showing of entitlement, the court is not obligated to provide any specific remedy and it might, for example, conclude the appropriate relief is immediate disclosure. In this case, the trial court could reasonably conclude that appellant failed to establish that qualifying materials were not provided within a reasonable time upon informal request and appellant is not statutorily entitled to any further disclosures at present.

Finally, the parties indicate that an administrative appeal hearing had not been held as of the filing of the appellate briefs. It is entirely premature to evaluate the adequacy of any administrative appeal process.[6]

In sum, the record does not support an award of backpay or other requested remedies at this time.

---

[6] "An administrative appeal instituted by a public safety officer under this chapter shall be conducted in conformance with rules and procedures adopted by the local public agency." (§ 3304.5.)

E. *Disposition*

The February 25, 2005 order of the court denying the petition for writ of mandate is affirmed. Appellant shall bear costs on appeal.

Rushing, P. J., and Premo, J., concurred.